IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DANIELA B.,** | : | **CIVIL ACTION** |
| Plaintiff, | : | |
| | : | |
| vs. | : | NO.   23-cv-1939 |
| | : | |
| **MARTIN J. O'MALLEY,** | : | |
| **Commissioner of Social Security,** | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                                                      June 20, 2024

Plaintiff Daniela B. brought this action seeking review of the Commissioner of Social Security Administration's decision denying her claim for Social Security Disability Insurance (SSDI) under Title II of the Social Security Act, 42 U.S.C. §§ 401–433.  This matter is before me for disposition upon consent of the parties.  For the reasons set forth below, Plaintiff's Request for Review (No. 15) is **DENIED**.

**I.      PROCEDURAL HISTORY**

On January 10, 2019, Plaintiff protectively filed for SSDI, alleging disability since July 2, 2017, due to back and knee problems, depression, and anxiety.  (R. 284-85, 309).  Plaintiff's application was denied at the initial level, and upon reconsideration.  (R. 144-49).  She requested a hearing before an Administrative Law Judge (ALJ).  (R. 153-55).  Plaintiff, represented by counsel, and a vocational expert testified at the February 7, 2022 administrative hearing.  (R. 46-70).  At the hearing, Plaintiff's alleged onset date was amended to July 4, 2018.  (R. 50).  On February 24, 2022, the ALJ issued a decision unfavorable to Plaintiff.  (R. 25-39).  Plaintiff

appealed the ALJ's decision, and on April 7, 2023, the Appeals Council denied Plaintiff's request for review, thus making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. (R. 1-6).

On May 23, 2023, Plaintiff filed a complaint in the United States District Court for the Eastern District of Pennsylvania, and she consented to my jurisdiction pursuant to 28 U.S.C. § 636(C) on June 29, 2023. (Compl., ECF No. 1; Consent Order, ECF No. 6). On January 24, 2024, Plaintiff filed a Brief and Statement of Issues in Support of Request for Review. (Pl.'s Br., ECF No. 15). The Commissioner filed a response on February 16, 2024, and on February 29, 2024, Plaintiff filed a reply. (Resp., ECF No. 16; Reply, ECF No. 17).

## II.  FACTUAL BACKGROUND[1]

The Court has considered the administrative record in its entirety and summarizes here the evidence relevant to the instant request for review.

Plaintiff was born on July 4, 1968, and she was fifty years old on the amended alleged onset date. (R. 108). She graduated from high school and previously worked as a cleaner and a cook. (R. 310).

### A.  Medical Evidence

Before her amended alleged onset date (July 4, 2018), Plaintiff received treatment for back and knee complaints. (R. 472-530). She was prescribed Norco, Flexeril, and Celebrex. (*Id.*). A September 2016 MRI showed progressive discogenic disease at L5-S1 with decreased height of the disc and progressive endplate marrow changes but no significant change in the

---

[1] Because Plaintiff's request for review implicates only her physical impairments, the Court does not summarize the evidence relating to any mental impairments.

degree of moderate bilateral neural foraminal narrowing. (R. 437-38). Epidural lipomatosis had also decreased resulting in increased patency of the canal. (R. 438). A physical examination conducted in September 2016 indicated decreased lumbar range of motion and lumbar tenderness and pain, which resulted in a diagnosis of lumbar disc disease. (R. 473).

After a visit in May 2017, Plaintiff did not return to her primary care provider, Internal Medicine Associates of West Reading/Tower Health, until June 17, 2019. (R. 477-79). On her return visit, Fatima Karabashova, M.D., diagnosed degenerative joint disease of the right knee. (*Id.*). On June 28, 2019, Plaintiff went to urgent care at Orthopedic Associates of Reading ("OAR") for left knee pain, a steroidal injection was administered, and she reported some relief in her pain. (R. 731, 941-52).

An X-ray of Plaintiff's left knee was taken on June 20, 2019, which revealed minimal degenerative changes and tiny osteophytes arising from the medial femoral tibia and patellofemoral compartments. (R. 32, 111, 133). On June 27, 2019, an ultrasound of the left lower extremity showed a popliteal cyst. (R. 440).

An MRI taken on July 1, 2019 indicated mild progression of degenerative changes since the 2016 study. (R. 444). At L4-L5, Plaintiff had small Schmori's nodes along the anterior inferior endplate of L4 with degenerative endplate changes, disc desiccation with minimal disc space narrowing, moderate facet arthropathy, and mild to moderate neuroforaminal narrowing. (*Id.*). At L5-S1, there were central disk protrusion with annular fissure, severe facet arthropathy, and mild to moderate left and moderate right neuroforaminal narrowing with a prominent facet spur contacting the right L5 nerve root in the neuroforamen. (*Id.*).

On July 22, 2019, after a five-year hiatus, Plaintiff returned to the Center for Pain Control for treatment. (R. 451). Jason T. Bundy, M.D., and April Palmer, NP, examined Plaintiff and

found that she walked with a slightly antalgic gait, there was difficulty eliciting deep tendon reflexes in the lower extremities, and she had positive lumbar facet loading, tenderness to palpation in the long lumbosacral area, and pain with straight leg raises. (R. 452). The pain specialists diagnosed lumbar spondylosis/facet arthropathy, and Plaintiff was prescribed Gabapentin and a course of steroidal injections. (*Id.*). Plaintiff underwent physical therapy on July 24, 2019. (R. 455-71). On July 31, 2019, Plaintiff was seen by Neva A. Ouilikon, M.D., a physician at Plaintiff's primary care provider. (R. 486). Plaintiff said that was unable to afford the copayments for physical therapy or epidural steroidal injections, but she indicated that she had followed up with a pain management specialist. (*Id.*).

Plaintiff received an epidural steroidal injection on August 13, 2019. (R. 794). At a follow-up pain management appointment on September 3, 2019, she reported some improvement with her pain. (R. 739). Plaintiff agreed to undergo bilateral facet injections. (R. 740). Furthermore, on August 15, 2019, Plaintiff was treated by an OAR orthopedist, Brian C. Stapinski, M.D. (R. 943). She had positive McMurray's tests bilaterally and an antalgic gait. (R. 946). Dr. Stapinski administered bilateral steroidal knee injections. (R. 947).

On September 17, 2019, state agency medical consultant John Simmons, M.D., found that Plaintiff was capable of performing the full range of a light Exertional Functional Capacity ("RFC"). (R. 115-18). The consultant also found that she could occasionally climb ladders, ropes, or scaffolds; occasionally crouch, crawl, and kneel; and frequently perform balancing and climb stairs or ramps. (R. 116-17). Upon reconsideration on April 9, 2020, Margel Guie, D.O., added a limitation for concentrated exposure to extreme cold and vibrations, but she otherwise agreed with Dr. Simmons's RFC assessment. (R. 132-35).

After her date last insured (September 30, 2019), on November 11, 2020, Plaintiff was

seen by Dr. Ouilikon for intermittent chronic low back pain and chronic bilateral knee pain. (R. 838). Upon physical examination, she had tenderness along the right lower back. (R. 840). X-rays taken on November 18, 2020 showed, in the right knee, moderate narrowing of the medial compartment and moderate sized osteophytes and, in the left knee, mild narrowing of the medial compartment and femoropatellar joint with small spurs. (R. 807, 819). On the same day, the orthopedist administered another round of bilateral knee injections. (R. 949).

Plaintiff reported improved symptoms when she was seen by her primary care provider on January 12, 2021. (R. 843). Spinal injections were administered in November 2021. (R. 33, 957). On December 15, 2021, Plaintiff was examined by Leah M. Frey, CRNP, at Pain Management - Tower Health Medical Group. (R. 956). Ms. Frey found that she had lumbar tenderness, decreased sensation to the right lateral thigh and calf, and reduced range of lumbar flexion with increased pain and decreased lumbar extension. (R. 963-64). On January 3, 2022, Plaintiff received additional knee injections. (R. 952).

      **B.**    **Non-Medical Evidence**

The record also contains non-medical evidence. In a March 10, 2020 Adult Function Report completed with the assistance of her husband, Plaintiff reported that she has unbearable pain when walking, standing, or maneuvering. (R. 330). She spends her days in her room, has difficulties with dressing and bathing, and could not prepare meals or perform household tasks. (R. 331-32). She goes outside once or twice a week with her husband or son, shops in stores, on-line, and by phone once a week for approximately a half hour to an hour, and is able to drive. (R. 333). Plaintiff does not socialize, but she does watch television, reads, and spends time and speaks on the phone with her husband and son. (R. 334). She checked boxes on the form indicating difficulties with lifting, squatting, bending, standing, reaching, walking, sitting,

kneeling, and stair climbing. (R. 335). She stated that she could lift one or two pounds, stand for ten minutes, and walk for two hundred yards for a half hour to one hour before having to rest for a half hour. (*Id.*). Plaintiff does not use any assistive devices. (R. 336-37).

In an attached Supplement to the questionnaire, Plaintiff stated that she has intense continuous lower back and knee pain, which spreads from the back to the thighs and knees, and is worse in the morning and evening, and when bending, standing, walking, and climbing. (R. 338). She further indicated that the pain began five years ago as a result of injuries she sustained. (*Id.*). It has affected her eating habits and caused her to gain weight. (R. 339). Plaintiff takes Hydrocodone/Apap, Gabapentin, Naproxen, and Cyclobenzaprine, which take a half hour to an hour to take effect and provide pain relief for two hours. (*Id.*). She also reported that the medications cause constipation, leg pain, ringing in the ears, and heartburn. (*Id.*). She listed hot showers and pain management treatment as things done to relieve the pain. (*Id.*).

At the February 7, 2022 administrative hearing, Plaintiff testified that she lives with her son and husband, who both work and support her. (R. 51). She said she stopped working in 2017 because of depression and pain. (R. 52). She generally sits in her house, and people rarely visit her. (R. 61). The pain is concentrated in her lower back, her right leg is numb through the knee and the right side of the calf, and there is pain in both her knees. (R. 57). She rejected back surgery because the results could not be guaranteed. (R. 53). Plaintiff said that she had injections, which help her for about three to four weeks and allow her to move around the house, wash dishes, and go shopping once a week for up to forty-five minutes to an hour. (R. 53-54, 58). She also takes pain medications daily and takes an additional dose if she is going to do something, like shopping. (R. 53-54, 58-59). The medications cause side effects such as drowsiness, dizziness, and a bitter taste in her mouth. (R. 58). Plaintiff indicated that her

treatment was previously limited because it was not covered by insurance, but she said that her husband recently obtained a better insurance plan allowing her to get more frequent injections. (R. 53-54).

Plaintiff testified that, whenever she performs an activity like washing the dishes, she needs to take a break every fifteen to twenty minutes for about twenty minutes because she can no longer handle the pain. (R. 57-58). She can stand in one place for a half hour to forty-five minutes, sit for an hour to two hours, walk for thirty minutes to an hour, and carry a gallon of milk. (R. 59-62). She cannot lift. (R. 62).

### III.  ALJ'S DECISION

Following the administrative hearing, the ALJ issued a decision in which she made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on September 30, 2019.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of July 3, 2018 [sic] through her date last insured of September 30, 2019 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: lumbar disc degeneration, bilateral degenerative joint disease of the knees, obesity, depressive disorder, and anxiety disorder (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equated the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR

404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except occasional performance of postural maneuvers with occasional climbing ramps or stairs, but no kneeling, crawling, or climbing ladders, ropes, or scaffolds.  No use of foot controls and no push/pull with lower extremities.  No exposure to unprotected heights.  Unskilled work with jobs involving simple routine tasks, making simple decisions, and occasional changes in the workplace.  Occasional interaction with coworkers, supervisors, and public.  Ability to alternate from standing to sitting every 30 to 60 minutes, with 10 minutes of change of position, while remaining on task.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on July 4, 1968 and was 51 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work

      experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11.    The claimant was not under a disability, as defined in the Social Security Act, at any time from July 4, 2018, the alleged onset date, through September 30, 2019, the date last insured (20 CFR 404.1520(g)).

(R. 27-39). Accordingly, the ALJ found Plaintiff was not disabled. (R. 39).

## IV.    LEGAL STANDARD

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to the Commissioner that she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. § 1382c(a)(3)(A). A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If she is not, then the Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of the impairment listed in the "listing of impairments," . . . which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform her past work. If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. § 404.1520(a)(4). The

disability claimant bears the burden of establishing steps one through four. If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner at step five to establish that, given the claimant's age, education, work experience, and mental and physical limitations, she is able to perform substantial gainful activities in jobs existing in the national economy. *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited. A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted). Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it. *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986). The court has plenary review of legal issues. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

## V.     DISCUSSION

In her request for review, Plaintiff raises one claim: the ALJ's RFC determination was not supported by substantial evidence because the ALJ failed to properly consider Plaintiff's subjective complaints. (Pl.'s Br., ECF No. 15, at 1). I conclude that the ALJ properly considered Plaintiff's subjective complaints.

Under Social Security Ruling 16-3p, the ALJ must follow a two-step process in evaluating the Plaintiff's subjective symptoms: (1) determine if there is an underlying medically determinable physical or mental impairment, shown by medically acceptable clinical and

laboratory diagnostic techniques, that could reasonably be expected to produce the Plaintiff's pain or symptoms; then (2) evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the Plaintiff's functioning. SSR 16-3p, 2016 WL 1119029, at *4-8 (Mar. 16, 2016). In evaluating the intensity, persistence, and limiting effects of a claimant's symptoms, the ALJ must consider relevant factors such as the objective medical evidence, evidence from medical sources, treatment course and effectiveness, daily activities, and consistency of Plaintiff's statements with the other evidence of record. *Id.*

It is within the province of the ALJ to evaluate the credibility of a claimant. *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983). "Although 'any statements of the individual concerning [his] symptoms must be carefully considered,' the ALJ is not required to credit them." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 363 (3d Cir. 2011) (citing SSR 96–7p and 20 C.F.R. § 404.1529(a)). An ALJ's "findings on the credibility of [a] claimant [] 'are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.'" *Irelan v. Barnhart*, 243 F. Supp. 2d 268, 284 (E.D. Pa. 2003) (citation omitted). An ALJ may disregard a claimant's subjective complaints when contrary evidence exists in the record. *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993). However, the ALJ must provide her reasons for discounting a claimant's testimony. *Burnett*, 220 F.3d at 122; *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

In this case, the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (R. 31). She then found that the subjective evidence "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (*Id.*). Plaintiff dismisses this finding as "typical boilerplate

11

language." (Pl.'s Br., ECF No. 6, at 6). She asserts that the ALJ "simply summarized the objective evidence," and, as part of this summary, listed positive diagnostic and examination findings without explaining how such findings could provide grounds for discounting Plaintiff's subjective complaints. (*Id.* at 6-7) (citing R. 31-33). Plaintiff also contends that the record includes similar objective evidence from before and after the relevant period that were consistent with her reported pain and limitations. (*Id.* at 7-8) (citing R. 438, 963-64). However, the ALJ purportedly failed to explain why she found such evidence unconvincing. (*Id.* at 8).

Plaintiff argues that the ALJ, by merely summarizing the evidence, thereby made it impossible for the Court to review its findings because it failed "to build an accurate and logical bridge" between the evidence and the result. (*Id.* at 8-9) (citing *Thompson v. Comm'r of Soc. Sec.*, No. 20-01687, 2022 WL 604898, at *3 (W.D. Pa. Mar. 1, 2022)); *see also id.* at 9 ("Similarly here, the ALJ's reliance on mere summaries of evidence asks the Court to assume the record evidence lead to the RFC, despite Plaintiff's supported complaints to the contrary.") (citing *Kashir v. Kijakazi*, No. 20-1441, 2022 WL 992529, at *6 (W.D. Pa. Mar. 31, 2022)).

The Commissioner responds that Plaintiff is wrong to assert that the ALJ's general recitation and summary of the evidence is not enough to meet the substantial evidence standard because this standard is not high. (Resp., ECF No. 16, at 8). He contends that substantial evidence supports the ALJ's assessment of Plaintiff's subjective statements of symptoms. (*Id.* at 8-15). The Commissioner indicates that, in this assessment, the ALJ properly considered Plaintiff's treatment history, the results of her physical examinations, imaging studies, health insurance status, medication side effects, and Plaintiff's subjective allegations of constant severe pain. (*Id.* at 10-13).

language." (Pl.'s Br., ECF No. 6, at 6). She asserts that the ALJ "simply summarized the objective evidence," and, as part of this summary, listed positive diagnostic and examination findings without explaining how such findings could provide grounds for discounting Plaintiff's subjective complaints. (*Id.* at 6-7) (citing R. 31-33). Plaintiff also contends that the record includes similar objective evidence from before and after the relevant period that were consistent with her reported pain and limitations. (*Id.* at 7-8) (citing R. 438, 963-64). However, the ALJ purportedly failed to explain why she found such evidence unconvincing. (*Id.* at 8).

Plaintiff argues that the ALJ, by merely summarizing the evidence, thereby made it impossible for the Court to review its findings because it failed "to build an accurate and logical bridge" between the evidence and the result. (*Id.* at 8-9) (citing *Thompson v. Comm'r of Soc. Sec.*, No. 20-01687, 2022 WL 604898, at *3 (W.D. Pa. Mar. 1, 2022)); *see also id.* at 9 ("Similarly here, the ALJ's reliance on mere summaries of evidence asks the Court to assume the record evidence lead to the RFC, despite Plaintiff's supported complaints to the contrary.") (citing *Kashir v. Kijakazi*, No. 20-1441, 2022 WL 992529, at *6 (W.D. Pa. Mar. 31, 2022)).

The Commissioner responds that Plaintiff is wrong to assert that the ALJ's general recitation and summary of the evidence is not enough to meet the substantial evidence standard because this standard is not high. (Resp., ECF No. 16, at 8). He contends that substantial evidence supports the ALJ's assessment of Plaintiff's subjective statements of symptoms. (*Id.* at 8-15). The Commissioner indicates that, in this assessment, the ALJ properly considered Plaintiff's treatment history, the results of her physical examinations, imaging studies, health insurance status, medication side effects, and Plaintiff's subjective allegations of constant severe pain. (*Id.* at 10-13).

In her reply, Plaintiff reiterates her claim that the ALJ's mere reference to, and summary of, the evidence constituted an insufficient explanation of her reasoning, particularly where several positive objective findings were found to be inconsistent with her subjective complaints without explanation. (Reply, ECF No. 17, at 1-2) (citing *Prodin v. Kijakazi*, No. 20-1372, 2022 WL 973703, at *4 (W.D. Pa. Mar. 31, 2022)).

Contrary to Plaintiff's assertions, the ALJ did not merely provide a "boilerplate" conclusion referencing a bare summary of the evidence. Instead, the ALJ contrasted Plaintiff's subjective statements, together with the objective evidence supporting her statements, with the other evidence that was inconsistent with the "the intensity, persistence, and limiting effects of" of Plaintiff's symptoms, including, as applicable, evidence of the factors listed in SSR 16-3p. *See* SSR 16-3p(2)(1)(1)-(7).

In making this assessment, the ALJ explained that the evidence supported a modified light RFC. (R. 33). She explicitly accommodated Plaintiff's limitations due to her lumbosacral degenerative disc disease and degeneration in her knees by restricting Plaintiff to occasional postural maneuvers with additional specified limitations on lower extremity use and no kneeling, crawling, or climbing ladders, ropes, or scaffolds. (*Id.*). To address Plaintiff's "specific allegations of pain, effects of medication, and needing change positions," the ALJ found there could be no exposure to unprotected heights and that she had the ability to alternate from standing to sitting every 30 to 60 minutes, with 10 minutes to change. (*Id.*). The ALJ also specifically considered, but found no support for, any additional limitations to the assessed RFC. (R. 35). The ALJ rejected Plaintiff's "allegations of constant severe pain in 2017 or 2018" and her assertions regarding her reported difficulties with health insurance coverage on the grounds that Plaintiff had a large gap in treatment with her primary care provider from May 2017 to June

13

2019. (R. 35) (citing R. 472-530, 941-52). The ALJ explained that, despite this treatment gap, Plaintiff did not require emergency or urgent care for pain until June 2019, when she sought treatment for her knee pain. (*Id.*) (citing R. 941-52). Furthermore, the ALJ concluded that there was no evidence to support additional nonproductive limitations, including "time 'off task.'" (*Id.*).

Throughout her decision, the ALJ repeatedly highlighted record evidence that supported her RFC findings that was inconsistent with Plaintiff's subjective reports of disabling pain and other problems. The ALJ weighed Plaintiff's complaints of pain and other symptoms, the positive imaging and examination findings, and the treatment she received against the gaps in her treatment history and the generally non-abnormal findings in the imaging studies and her physical examinations. (R. 31-33).

Specifically, the ALJ acknowledged that the "abnormal imaging" showed moderate degenerative disease in her right knee, milder degenerative changes in her left knee, moderate degeneration at L4-L5 and L5-S1, and severe facet arthropathy at L5-S1. (R. 33) (citing R. 414-50, 799-835). As to the non-abnormal findings, she observed that the 2016 MRI showed improvement at L4-L5 and L5-S1 due to a decreased size of epidural lipomatosis, and that the 2020 X-rays revealed no joint effusion in either knee. (R. 32-33) (citing R. 437-38, 807, 819).

The ALJ further noted that, prior to her alleged onset date, medical records reflected treatment for musculoskeletal complaints. (R. 31-32) (citing R. 472-530). The ALJ found that, subsequently, Plaintiff received urgent care treatment in June 2019 for left knee pain and received a steroidal injection; when she was examined by a pain management specialist in July 2019, she reported low back pain radiating into her lower extremities, and, on examination, was found to have a slight antalgic gait, positive lumbar facet loading, tenderness to palpation in the

long lumbosacral area, pain with straight leg raise tests, and difficulty to elicit deep tendon extremities; at an August 2019 orthopedic visit, Plaintiff's gait was antalgic, and she had positive McMurray tests bilaterally; and steroidal knee and epidural injections were administered in August 2019.  (R. 32-33) (citing R. 472-530, 731, 941-52, 941-52).  The ALJ's ruling also stated that, after her date last insured, Plaintiff returned to her primary care provider in November 2020 complaining of chronic low back pain and presented with tenderness to palpation along the right lower back.  (R. 33) (citing R. 836-924).  The ALJ further noted that additional injections were administered in November 2020 and November 2021, and, in December 2021, Plaintiff presented with tenderness to palpation, decreased sensation to right lateral thigh, and reduced range of lumbar flexion/extension.  (*Id.*) (citing R. 836-924, 941-52).

     However, the ALJ explained that "the claimant was universally found to have intact strength with no swelling, edema, or joint effusion, and [merely] intermittent findings of normal gait and intact sensation."  (*Id.*) (citing R. 451-54, 472-530, 739, 748, 941-52).  She pointed out that Plaintiff reported some improvement with her pain from the injections; at her July 2019 pain management visit, she was able to rise from a seated position without assistance; at her August 2019 appointment with the orthopedist, she presented with full strength, intact sensation, and full range of motion; she had a full range of motion in her bilateral knees with minimal clicking in November 2020; and, in December 2021, she presented in no acute distress.  (R. 32-33) (citing R. 45-54, 731, 739-48, 777-98, 836-966).  The ALJ also emphasized the several gaps in her treatment.  Specifically, after seeing her primary care provider in May 2017, Plaintiff did not return until June 2019.  (R. 32) (citing R. 477).  She likewise returned for pain management treatment in July 2019 following a five-year hiatus.  (*Id.*) (citing R. 451-54).  After August 2019, she did not receive another round of injections, or see her primary care provider, until November

15

2020. (R. 33) (citing R. 836-924). As the ALJ observed in rejecting her allegations of constant severe pain in 2017 or 2018, "even without [a] primary care provider or refill of medications, the claimant did not require emergency room or urgent care for pain until June 2019." (R. 35) (citing R. 941-52).

In light of the substantial evidence inconsistent with Plaintiff's subjective statements regarding the intensity, persistence, and limiting effects of her symptoms, the ALJ's finding that her statements were not consistent with the record cannot be dismissed as "the typical boilerplate language." (R. 31; Pl.'s Br., ECF No. 15, at 6). Instead, the ALJ has "buil[t] an accurate and logical bridge between the evidence and the result," which "shows how [her] consideration of the evidence led [her] to [her] findings" concerning Plaintiff's subjective complaints. *Thompson*, 2022 WL 604898, at *3. Accordingly, The ALJ did not err when she discounted the inconsistent subjective statements.

## VI.    CONCLUSION

For the reasons set forth above, Plaintiff's request for review is **DENIED**. An appropriate Order follows.

BY THE COURT:

　 /s/ Lynne A. Sitarski　　　
LYNNE A. SITARSKI
United States Magistrate Judge